HAVENS, Respondent, vs. HAVENS, Appellant.

*February 5—March 2, 1954.*

For the appellant there was a brief by *Langer & Cross* of Baraboo, and oral argument by *Harold M. Langer* and *Clyde C. Cross.*

For the respondent there was a brief by *Hill, Miller & Hill* of Baraboo, and oral argument by *James H. Hill, Jr.*

STEINLE, J.   Appellant contends that the emergency doctrine is applicable to him as a matter of law for the reason that while he was proceeding with due care he was suddenly confronted with a car 250 to 500 feet away, approaching him on the wrong side of the road and coming toward him at a high rate of speed.  He urges that he ought not be held negligent because he turned to the left side of the road at the last instant in an attempt to avoid a head-on collision.  He maintains too, that he ought not be held liable to his wife for his action deliberately taken, as a pure exercise of judgment, in choosing between alternative avenues of escape.  It is also the position of the appellant that under the circumstances he was not negligent as to speed or that, if such finding must be maintained against him, then the plaintiff assumed the risk.  Error is also alleged because the trial court did not submit to the jury certain questions pertaining to the failure of the wife to warn her husband of the danger ahead as well as questions affecting her assumption of risk,—questions of that kind having been specifically requested.  Error is also claimed as to certain of the court's instructions.

The collision occurred at about 4 a. m. on July 9, 1950, at a point on U. S. Highway 12 approximately 18 miles north of Baraboo.  The 20-foot-concrete highway in the immediate vicinity of the collision was straight, level, dry, in perfect condition, and passed through open country in a generally east-west direction.  A shoulder 10 feet wide extended south from the edge of the pavement.

Mr. and Mrs. Havens were returning to their home in Chicago from a trip to Minnesota.  The weather was clear, it was starting to get light and as testified by the plaintiff, "it was sort of on the grayish side."  The headlights on the car were lit.  On the night of July 8th the couple had stayed

at Mauston, about 15 miles away. They retired at 11 p. m., arose at 3 a. m., and resumed their journey. They were awake, alert, and both watched the road ahead. Shortly before the collision they were traveling about 40 to 50 miles per hour in an easterly direction and in the proper lane. This was the same rate of speed or a little slower than that at which the husband customarily drove generally as well as on this particular trip. The wife testified that she made no protest as to his speed, that she was satisfied with it, and that in her opinion the husband was not driving too fast under existing circumstances. Shortly before the accident the husband observed the lights of a car that was following them. However, he did not know how close behind him that car was coming. As husband and wife were looking ahead, they both at the same time observed the car driven by Alvin Miner as it approached them from the east. It was traveling fast and their estimate of its speed was 60 miles per hour. It came toward them on the wrong side of the road, swayed from side to side in their lane and partly on the south shoulder. It did not slow down. When it was a car length away and immediately in front of the Havens car, the husband swung his car sharply to the left and at about the same time Alvin Miner turned his car toward his right. The collision occurred approximately at the center of the highway.

The wife testified that the car driven by Miner was about 400 to 500 feet away when it first came over on their side of the highway. The husband, in his testimony, stated that his first observation was that of the headlights of the car that was coming toward them. The husband said: "He [Miner] was on his right side of the road when I first saw him, about 500 feet I'd say, and then he crossed over onto my side of the road . . . when it first came over onto my side of the road it was between 250 to 500 feet to the best of my knowledge."

The husband testified that when he first observed the .car driven by Miner approaching on the Havens' side of the road, he released the accelerator, blew his horn twice, and applied his brakes lightly. Mrs. Havens said that after she first observed the car coming down the wrong side of the road toward them she watched it intently and also looked at her husband. She had no idea as to what the other driver would do and her thoughts were as to what her husband was going to do. She did not speak to her husband,—depended upon him. She thought he would turn to the right and onto the shoulder.

Neither husband nor wife recalled that the husband applied his brakes hard before the crash. A police officer testified that he found a skid mark measuring 42 feet in length, apparently from the left rear wheel of the Havens car, which started in the eastbound lane, continued straight in that lane for most of its distance, and then swung north and crossed the center line just back of where the Havens car came to rest. When both cars had stopped, most of the Havens car was situated on the north side of the highway and most of the other car on the south side.

Alvin Miner admitted to the investigating police officer that he had been drinking, that he saw the Havens car coming, tried to get back into his own lane but could not do so because his coat sleeve became caught on the steering knob.

The learned trial court in its decision on motions after verdict in part stated:

"The matter of Harry Havens' negligent control and management presents a very serious question and has entertained the court's careful consideration. The court has reviewed all the cases cited in defendant's brief and, notwithstanding the effective arguments made in the interest of a change in the answer, feels compelled to let the answer of the jury stand. This case must stand on its own facts.

Harry Havens had a dry pavement, a travelable ten-foot shoulder to his right, and a straight level road. He saw the invading car 500 feet away, wholly in his lane of travel and without indication that it would right itself. He maintained his speed, except for a minor reduction, held onto his position in his lane, approached the offending car, and at the last moment turned left. When he first saw the other car no immediate emergency absolutely confronted him. If an emergency did finally materialize it can well be said that he made some contribution to bring it about. He should have known, as a common driver, when he first saw this car in his lane 500 feet away that an emergency might well develop if he did not take the precautions at his command to prevent it. His brakes could have been applied forcibly. His car could have been directed to the wide right shoulder. In any event he could have stayed in his own lane. By swinging left he deliberately gambled that the other car would remain and continue in its wrong lane. At the last second an emergency likely existed, but all of his conduct from the time these cars came into view of one another must be considered.

"While the principle of law is that a man's conduct in an emergency is excused, I believe it would be wrong to apply that principle to the particular facts at hand."

After a very careful analysis of the record we find that we cannot agree with these expressed views of the trial court.

When Havens saw the car driven by Miner bearing down on him in his lane of travel, the automobiles were then 250 to 500 feet away from each other. The testimony is not disputed that the oncoming car driven by Miner was traveling at the rate of 60 miles per hour and the speed of the Havens car at from 40 to 50 miles per hour. The cars were closing the gap between them at the aggregate rate of 100 to 110 miles per hour, and were covering something between 147 feet per second (at 100 miles per hour) and 161 feet per second (110 miles per hour). The total time which elapsed between the instant when Havens first saw the other car and the moment of the collision was something between

one and one and one-half seconds (250 feet at 161 feet per second) and a maximum of three and one-half seconds (500 feet at 147 feet per second). Havens was faced with the situation of a car coming at him and swaying in his lane at a fast rate of speed.

Counsel for appellant points out that Harry Havens not only had to determine just what that car was doing, but he also had to attempt to ascertain what it was going to do next in making his quick appraisal of the situation confronting him and deciding just what he had best to do to attempt to avoid it. We concur in that view. The physical facts indicate that he applied his brakes very hard at a point 42 feet before he brought his car to a stop. It is contended by respondent that Havens ought to have exerted more pressure on the brakes sooner than he did and that he ought to have come to a stop in his own lane. It is very likely that such course would have subjected him to the risk of being struck in the rear by the car that was following him or being struck head on if Miner persisted in his course. Respondent also maintains that had Havens turned onto the shoulder of the road to his right the accident would have been avoided. However, Miner in his approach was swaying on and off from that shoulder. We are of the opinion that Havens was fully alert to the danger as soon as he should have been. He promptly took steps to avoid a collision as best dictated by his judgment. He reduced his speed by taking his foot off from the accelerator. He blew his horn twice in an effort to attract the approaching driver's attention to the peril. He had a right to assume that the car approaching him on the wrong side of the highway would return to its own side. When at the last moment he saw the approaching car immediately ahead of him and but a car length away, he swung to the left in an attempt to avoid a head-on collision. Havens did not create the emergency which, under the circumstances,

commenced at the time that he first observed the oncoming car in his lane not more than 500 feet away.

This case is controlled by the principles laid down in *Schwab v. Martin* (1938), 228 Wis. 45, 279 N. W. 699; *School v. Milwaukee Automobile Ins. Co.* (1940), 234 Wis. 332, 291 N. W. 311; *Hoehne v. Mittelstadt* (1948), 252 Wis. 170, 31 N. W. (2d) 150; *Feinsinger v. Bard* (7th Cir. 1952), 195 Fed. (2d) 45. In each of these cases it was held that the emergency doctrine was applicable as a matter of law.

Here the appellant had but three and one-half seconds at most to appraise the developing situation, calculate his best maneuver, and execute it. In *School v. Milwaukee Automobile Ins. Co.* and *Feinsinger v. Bard, supra,* the time between the observation and the crash was seven seconds.

We are of the opinion that Harry Havens, as a matter of law under these facts, must be deemed to have been confronted with an emergency from the instant that he first saw the invading car, not more than 500 feet away and that he exercised such skill and judgment as he possessed.

In view of this conclusion we deem it unnecessary to determine the other points raised on this appeal.

*By the Court.*—Judgment reversed and cause remanded with directions to enter judgment dismissing plaintiff's complaint upon its merits.