LAUGHNAN (Lauretta), Plaintiff and Respondent, vs. AETNA CASUALTY & SURETY COMPANY and others, Defendants and Appellants. [Case No. 287.]

BERGENSKE, by Guardian *ad litem,* Plaintiff and Respondent, vs. AETNA CASUALTY & SURETY COMPANY and others, Defendants and Appellants. [Case No. 288.]

LAUGHNAN (Carl), Plaintiff and Respondent, vs. AETNA CASUALTY & SURETY COMPANY, Defendant and Appellant. [Case No. 289.]

ARMBRECHT, by Guardian *ad litem,* Plaintiff and Respondent, vs. AETNA CASUALTY & SURETY COMPANY, Defendant and Appellant. [Case No. 290.]

*May 6—June 4, 1957.*

116

For the appellant Aetna Casualty & Surety Company in all cases there was a brief and oral argument by *D. V. W. Beckwith* and *William L. McCusker,* both of Madison.

For the appellants Shelby Mutual Casualty Insurance Company and Carl Laughnan in Cases Nos. 287, 288, and 290 there were briefs by *Schlotthauer & Jenswold* of Madison, and oral argument by *John F. Jenswold.*

For the respondents in Cases Nos. 287 and 288 there was a brief by *McAndrews & Melli* of Madison, for Lauretta Laughnan, and by *Riley, Riley & Pierce* of Madison, for Rose Bergenske, and oral argument by *Joseph A. Melli* and *Thomas W. Pierce.*

For the respondents in Cases Nos. 287, 289, and 290 there was a brief by *McAndrews & Melli* of Madison, for Lauretta Laughnan and Claire Laughnan Armbrecht, and by *James C. Geisler* of Madison, for Carl Laughnan, and oral argument by *Mr. Geisler.*

BROWN, J. The appeals are principally concerned with (1) the question of whether there was causal negligence of Carl Laughnan in the management and control of his automobile; (2) whether Carl Laughnan violated the terms of his insurance policy, issued by Shelby Mutual Casualty Insurance Company, by a failure to co-operate with his insurer in the defense of the actions and thereby released his insurer from its contract; (3) whether the Aetna Casualty & Surety Company, for the purpose of these actions, is the insurer of Dale Smith. Subordinate issues concern possible contributory negligence on the part of Laughnan's passengers and, if Aetna Casualty & Surety Company is found liable, the limits of its liability.

The action begun by Lauretta Laughnan against the defendants Carl Laughnan and Shelby Mutual Casualty Insurance Company, his insurer, the estate of Dale Smith, and Aetna Casualty & Surety Company, alleged to be Smith's insurer, and John Roadge, Smith's partner, presents most of the issues. The results of the other appeals will depend largely on the issues as resolved in this one. We will consider first the merits of the action and will state the facts from evidence the jury was entitled to believe, and which best supports the verdict.

At quarter past four in the afternoon of January 26, 1952, plaintiff Lauretta Laughnan was a passenger in the front seat of an automobile driven by her husband, defendant Carl Laughnan, proceeding westerly on Highway 30 in Waukesha county. At the place of the accident the highway was straight and the road level, though some 1,000 feet to the west a rise in the ground shut off further view of the highway. At this place the highway is a two-lane, black-top road, about 22 feet wide, having 9-foot shoulders on each side covered with gravel. There was mist or a light drizzle in the air, and in this vicinity the highway contained icy patches and was slippery. There was snow in the fields and ditches but the shoulders were bare. Mr. Laughnan's speed was 30 to 40 miles per hour. As Laughnan approached the point of collision, ahead of him and about 1,500 feet away, he and his passengers saw the automobile driven by Dale Smith appear over the crest of the grade, proceeding easterly. They estimated Smith's speed variously, up to 60 or 65 miles per hour. Smith's car was swerving from side to side as it approached, straightening out momentarily and then resuming its erratic course. Mr. Laughnan took his foot off his accelerator and allowed the speed of his car to diminish slightly, but continued to drive toward the Smith car upon his own right (north) side of the highway. When the cars were nearly in passing position Smith swerved

sharply to the north, coming over to that side of the road and colliding there with Laughnan. As Smith did so, Laughnan put his brakes on hard and attempted to turn onto the right shoulder but was unable to avoid the collision. Smith was killed and the occupants of Laughnan's automobile were injured.

The jury found Smith causally negligent in management and control, position on the highway, and in speed. It found Laughnan causally negligent in management and control and found that in these respects he increased the risk assumed by his guests when they entered the automobile. It apportioned the causal negligence 85 per cent to Smith and 15 per cent to Laughnan. Judgment in favor of Mrs. Laughnan was entered on the verdict with provisions as already set forth. Aetna Casualty & Surety Company appeals on the ground that its policy of insurance did not afford liability coverage to Smith. Laughnan and Shelby Mutual Casualty Insurance Company appeal on the ground that as a matter of law, on the evidence in the record, Laughnan was not guilty of any causal negligence and that he was confronted with an emergency not of his own making which excuses him from liability when his efforts to prevent the collision were unsuccessful; also that the evidence raised a jury question of the contributory causal negligence of Mrs. Laughnan and the trial court erred in refusing appellants' request to include a question on that subject in the special verdict. Shelby Mutual Casualty Insurance Company has an individual appeal also, asserting that Laughnan failed to co-operate with the company in his own defense. When the company sought to raise this defense during the trial its motions to that effect were denied and the trial court also refused the insurer's request to include a question on the subject in the special verdict. Shelby Mutual Casualty Insurance Company submits that the court erred in so doing.

Our first consideration is the contention of Laughnan and Shelby Mutual Casualty Insurance Company that as a matter of law the evidence establishes Laughnan's freedom from causal negligence. The jury had heard credible testimony that when the two automobiles were about 1,500 feet apart and Laughnan was 500 feet from the place of collision Smith's control of his car was observed to be precarious and from that time forward his control, as seen by Laughnan, was obviously defective. Laughnan's only reaction to the warning given by the erratic course of Smith's car, was to take his foot off his accelerator and, possibly, to touch his brakes lightly, meanwhile driving toward apparent danger at a speed of some 40 miles per hour. Whether his was the conduct of an ordinarily prudent man under the circumstances was clearly a jury question, and the jury might find that by continuing as he did for some fifteen seconds after he saw Smith was in difficulty, thus reducing the time and space in which Smith might regain control, Laughnan impaired Smith's opportunity to do so. The emergency of the last few split seconds was thus in part created by Laughnan, which prevents the excuse of the emergency doctrine, as applied in *Havens v. Havens* (1954), 266 Wis. 282, 63 N. W. (2d) 86, and *Klas v. Fenske* (1946), 248 Wis. 534, 546, 22 N. W. (2d) 596, from being available to him. We conclude on this phase of the litigation the verdict must be sustained.

Appellants' next contention is that Mrs. Laughnan was guilty of contributory negligence in failing to warn her husband of the approaching danger or suggesting means for him to avoid it. They concede that he saw the Smith automobile as soon as it was in sight. There is evidence of exclamation by one or more of his guests directing attention to the zigzag course of Smith's vehicle. Under the testimony of speed and distance, about fifteen seconds elapsed from the time Smith was first seen to the time of collision. Appellants submit that this was ample for Mr. Laughnan's passengers

to tell him what to do and it was their duty so to instruct him if they had reason to believe he was not aware of the danger or was not taking proper precautions. Mrs. Laughnan had no reason to believe that Mr. Laughnan was not aware of everything of which she was, or should have been aware. As to instruction, the car contained other passengers with similar obligations, if appellants are right. A chorus of possibly conflicting suggestions concerning the management of an automobile from passengers attempting to perform the duty which appellants attempt to assign to them is calculated to confuse rather than to instruct. As we said in *Goehmann v. National Biscuit Co.* (1931), 204 Wis. 427, 430, 235 N. W. 792, "The momentary management of the car should be left to the driver. . . . Continual suggestions are but confusing and irritating, and we think it better that it be definitely understood that neither duty devolves upon, nor prerogatives belong to, the occupants of a car to participate in its immediate management and control." The evidence here would require the court to determine as a matter of law that there was no breach of duty on the part of Mrs. Laughnan to warn or instruct her husband, hence no contributory negligence on her part. The trial court did not err in omitting such a question from the verdict.

Shelby Mutual Casualty Insurance Company appeals separately from the trial court's refusal to permit Shelby Mutual to withdraw from Laughnan's defense and its refusal to permit Shelby Mutual to amend its pleadings so as to assert a policy defense. In support of its motions Shelby Mutual asserts that Laughnan failed to co-operate with his insurer, contrary to the obligation to do so imposed on him by the insurance policy. The alleged lack of co-operation is, first, that Laughnan assisted his wife in obtaining counsel to prosecute her own claim for damages, which involved a claim against himself, and second, that Laughnan misin-

formed and misled Shelby Mutual Casualty Insurance Company concerning the facts of the accident.

If there is merit to the argument that lack of co-operation arises from Laughnan's activity in his wife's behalf, that activity occurred and was known to the insurer several years before the trial, yet the company proceeded with the defense without protest until the eighth day of a nine-day trial. The court held that the motions made for this cause were not timely, in which we agree.

To establish further lack of co-operation Shelby Mutual Casualty Insurance Company complains that soon after the accident Laughnan gave the company a statement saying that he first saw the Smith car when it was perhaps 600 feet distant, and repeated this estimate at an adverse examination held two years before trial, whereas at the trial he testified that he first saw Smith when the latter was 1,500 feet away. The first statements were estimates only and were known to be such by Shelby Mutual's counsel. On the adverse examination Laughnan testified that he was a bad judge of distance and Smith might have been 1,600 feet away rather than 600. On the first day of trial counsel for Shelby Mutual went with Laughnan to the scene of the accident where Laughnan pointed out the positions of the automobiles at various material times. Counsel measured the distances and thereby ascertained that when Laughnan first saw Smith the latter was 1,500 or 1,600 feet distant. Thereafter, Shelby Mutual proceeded with the defense for eight days without protest. A claim of a policy defense based on these variations on the ninth day is certainly untimely, nor under these circumstances, do we think they raise any issue of lack of co-operation.

Shelby Mutual Casualty Insurance Company further submits that on the seventh or eighth day of the trial Laughnan changed his testimony to say that Smith's car swerved about in the road during the entire time it was in sight, whereas on

all other occasions, including when he was a witness early in the trial, he had maintained that Smith swerved at first but regained control and kept it until the cars were about to pass each other. Shelby Mutual maintains that this alteration prejudicially affects the "emergency" defense and Laughnan's claim of due care, and constitutes a failure of co-operation.

Laughnan's testimony was not in all respects and at all times consistent. This is not unusual, to say the least, nor does it necessarily indicate the witness' bad faith. Ordinarily the inconsistency comes about as a result of more-searching questions put to the witness at one time than another. Shelby Mutual interprets the earlier statement and testimony to indicate that after the initial swerve Smith apparently regained control until the final 25 feet, and thus lulled Laughnan into a sense of security, so that Shelby Mutual was surprised and prejudiced when Laughnan testified later that Smith had evident difficulty in control at all times.

In the statement Laughnan gave the company's investigator shortly after the accident he did not say that Smith had his car under control at any time following the first swerve into Laughnan's traffic lane. On Mr. Laughnan's discovery examination before trial, July 8, 1954, he said he thought it was true that, after the first skid, Smith never brought his car completely under control; that Smith swerved like a snake reaching the center line five or six times and once coming over into Laughnan's lane. Condensed, his testimony was: "He zigzagged, he crossed into my lane and then he continued to zigzag a little; before the final swerve he appeared to run straight for 50 to 70 feet."

On the same occasion he testified:

"*A*. Well, I might as well just tell you when I first seen him, he seemed to be going just a little bit fast for the condition of the road, and then immediately soon after that he got over into my lane, and as I remember, he was coming

over on a slight curve this 600 or 700 feet ahead of me, westerly, and as he rounded down there the slight curve, he got over in my lane of traffic and then as he tried to get back over in his own lane, that is when he started this swerving like he was. Now, as I recall this road, as he came toward me he had a—it might have had a northerly exposure and there might have been more ice there, but he certainly was on some ice because he was in trouble and he swerved back and forth and then he got over in his own lane and continued on it for a short distance up to the time he slid off and his wheels hit the gravel on the right-hand side and seemed to throw him diagonally across the road at me."

This was information which Shelby Mutual had from Laughnan two years before the trial.

On July 12, 1956, the first day that Laughnan testified on the trial, he was called adversely and said:

"Well, he come up on this road, and I don't know why but my first attention was drawn to the fact he was driving a little fast,—it was misty or kind of a misty snow, and immediately he swerved he slid over into my line of traffic; and at that point I realized he was having a little trouble, because he slid back in his own lane. And then he slid along maybe to the center line again, straddling it about, as I recall. And that was when I was really alarmed, and I said something to my wife,—she don't recall what it was nor neither do I, because we both observed it, I know that she saw it the same as I did, and I was worrying about my family then. Then he proceeded, and he swerved maybe over a little farther into my lane, and maybe back in his,—I can't say for sure, but he was continuing his speed and he didn't have full control of his car."

Shelby Mutual Casualty Insurance Company continued the defense without protest, nor do we think a protest for an alleged lack of co-operation would have had merit. On July 18th, called in his own behalf, Laughnan testified:

"*Q.* Mr. Laughnan, what was the position of his car on the highway just prior to this last swerve, just prior to the time that he got his wheel on the gravel, as you testified? *A.* Before he struck this gravel?

"*Q.* Yes. *A.* Well, his position—he was in his own lane.

"*Q.* On his own right side? *A.* On his own right side. But, as I say, he was meandering a little bit."

The most that can be said for Shelby Mutual's present contention is that at one time Laughnan testified that for a space of 50 to 70 feet, in a distance of approximately 1,000, Smith appeared to run straight. From that the company charges that Laughnan misled it and when he testified on the trial that Smith's course was always erratic he raised a jury issue concerning his co-operation. This overlooks Laughnan's testimony on discovery examination two years previously that Smith was zigzagging down the road continually. We do not think the variations are material or that they raised a jury question of Laughnan's lack of co-operation. The trial court correctly denied Shelby Mutual's effort to raise the policy defense on these facts.

Our conclusion is that Lauretta Laughnan's judgment against Carl Laughnan and Shelby Mutual Casualty Insurance Company must be affirmed.

Respondents Rose Bergenske and Claire Laughnan Armbrecht were guests in the Laughnan automobile. The appeals from judgments in their favor by Shelby Mutual and Carl Laughnan are based on the proposition that these guests were guilty of contributory negligence which bars their recovery of damages. What has been said on that subject in the appeal from the Lauretta Laughnan judgment applies equally to these appeals and to the appeal from the judgment in favor of Richard B. Corcoran for damages he incurred by reason of injuries sustained by his daughter, the above-named Rose Bergenske. The judgments in favor of these

respondents against appellants Shelby Mutual Casualty Insurance Company and Carl Laughnan must be affirmed.

The appeals by Aetna Casualty & Surety Company from all the judgments remain to be considered. Aetna was held liable because the trial court determined that its policy of insurance under the unusual circumstances of these cases afforded coverage to Dale Smith. A recitation of the material facts appears in *Laughnan v. Griffiths* (1955), 271 Wis. 247, 73 N. W. (2d) 587, beginning at page 253. For present purposes it is sufficient to say that prior to this accident Aetna had issued a garage policy to one Tester Lea who operated a garage at Oregon, Wisconsin. Dale Smith had previously worked for Lea but had left that employment and at the time of the accident was a partner of defendant Roadge in a filling-station business in Milwaukee. A patron brought his Cadillac automobile to Smith to have it repaired and painted. Without prearrangement or permission from Lea, Smith drove the car to the Lea garage and welded and painted it there. He offered Lea no compensation and Lea made no charge. Smith simply availed himself of Lea's facilities. When the job was done Smith drove the Cadillac back toward Milwaukee and on the way collided with Laughnan. Investigators for parties involved in the accident called on Lea soon after its occurrence and he gave them statements concerning his connection with Smith. Apprehending that these approaches foretold his own involvement, Lea reported the calls to his Insurance Company, Aetna, and Aetna representatives called on him and otherwise investigated his connection with Smith and the other pertinent circumstances. Eventually the current actions were begun and in them Lea and Aetna were joined as defendants. They moved for summary judgment dismissing the action as to them. For reasons which appear in *Laughnan v. Griffiths, supra,* we directed dismissal as to Lea but for reasons peculiar to Aetna, alone, held that company as a defendant

until certain issues pertaining to its insurance policy might be determined on trial. These issues were litigated upon remand of the causes and are before us in the present appeals.

Sec. 85.09 (5) to (16) (c), Stats., comprises Wisconsin's Safety Responsibility Law. Its purpose is to see that damages to others incurred in a past accident occurring through the negligence of an operator of a motor vehicle are compensated for as a condition of not suspending the driver's license and the vehicle registration. *Laughnan v. Griffiths, supra* (pp. 256, 257). To avoid suspension of license and registration the driver and owner may deposit with the commissioner of motor vehicles security to satisfy a judgment for damages.

"The only statutory exception material to the instant case is the one which provides that the foregoing provision shall not apply to an owner or operator who had in effect an automobile liability policy of insurance applicable to the motor vehicle involved in the accident, which policy and the company issuing the same meet certain statutory requirements (sec. 85.09 (5) (b) and (c)). The insurance company which has issued such a policy is required upon receipt of notice of such an accident to 'furnish for filing with the commissioner a written notice that such policy . . . was in effect at the time of such accident' (sec. 85.09 (5) (d))." *Laughnan v. Griffiths, supra* (p. 257).

Sec. 85.09 (5) (c), Stats., at that time provided that the minimum limits of an insurance policy which would satisfy the statute were $5,000 for injuries to one person and $10,000 for injuries to two or more.

The commissioner has the power and duty to make rules and regulations to carry out the purposes of the statute.

". . . the commissioner has required that automobile liability insurance companies which seek to comply with the requirements of sec. 85.09 (5) (d), by filing a notice of insurance coverage as to a past-reported accident, do so on a prescribed standard form designated as an 'SR-21.' . . . Such official SR-21 form contains the following two ques-

tions which must be answered by the company filing the same:

"'Does this policy apply to the above owner in above accident?'

"'Does this policy apply to the above operator in above accident?'

"Aetna, in the completed SR-21 form filed by it with the commissioner on March 6, 1952, answered both questions 'Yes.' Prior to filing such SR-21, Aetna had obtained a signed statement from Lea dated February 28, 1952, setting forth essential facts relative to the use which Smith had made of Lea's premises and equipment without charge. . . ." *Laughnan v. Griffiths, supra* (pp. 257, 258).

Although Aetna thus informed the commissioner that its policy covered Smith in the above accident, at the time of its motion for summary judgment it had concluded that there was no such coverage and that it had filed the SR-21 by mistake. The respondents then and now contended that after a lapse of thirty days during which, by commissioner's regulations, the security of the SR-21 might be withdrawn and the driver's license and car registration revoked, the representations of the SR-21 became conclusive and evidence of mistake in filing the SR-21 became immaterial. We did not decide that question but said:

"We confine our determination at this time to holding that an automobile liability insurance company can make itself liable on a policy issued by it where, after investigating the facts, it, acting through a duly authorized agent or employee, voluntarily files with the commissioner an SR-21 form admitting coverage as to the accident described in such SR-21 intending to be bound thereby, even though without the filing of the SR-21 there might not be liability. Whether Aetna did, or did not, do so in this instance presents an issue of fact as to which the plaintiffs are entitled to have a trial. The affidavits filed in behalf of Aetna are insufficient to dispose of such issue as a matter of law for the reasons hereinbefore pointed out." *Laughnan v. Griffiths, supra* (pp. 259, 260).

Accordingly the consolidated actions were remanded and proceeded to trial and the circumstances under which Aetna filed the SR-21 became of great importance on the question of its liability.

On February 28, 1952, not long after Aetna received notice of the accident at its Milwaukee office its investigator, Mr. Narum, called on Lea at Oregon. He interviewed Lea and Mrs. Lea and made out an accident report. On his return to Milwaukee he consulted with his superior, Mr. McGinn, and they agreed that the policy Aetna had issued to Lea gave no coverage to Smith, but that a file had better be made up on the case to await developments. Mr. Narum deposited the accident report and some other documents pertinent to the case on a desk in the registration department for the proper clerk to make up the file. None of the material so left by Mr. Narum directed the filing of an SR-21. The file was made up by Alice Teresinski, who was a person authorized to sign and file SR-21s. Not finding a direction in the material before her, Miss Teresinski asked her superior, Mrs. Wiese, whether one was to be filed. Miss Teresinski testified that when she was first employed she was instructed to ask Mrs. Wiese when in doubt, had always done so and had followed Mrs. Wiese's directions. Mrs. Wiese testified that although Mr. McGinn usually gave these directions concerning SR-21s, in his absence she gave them and had been doing so since 1945 when the Safety Responsibility Law went into operation. Mr. McGinn and others testified that while Mrs. Wiese had authority to make final decisions in minor claims her authority did not extend to larger ones nor to directing the filing of SR-21s, and that they did not know she had been accustomed to do so. At any rate, when asked by Miss Teresinski, Mrs. Wiese told her to file an SR-21 and with a red pencil made a notation to that effect on the accident report. The notation appears on the report, an exhibit. Accordingly, on March 4, 1952, Miss Teresinski

made up an SR-21, signed it, and filed it with the commissioner of motor vehicles. Aetna had previously certified to the commissioner that Miss Teresinski was its authorized agent in such signing and filing. Simultaneously, Miss Teresinski completed and placed in the file a "face sheet" which recited that an SR-21 had been filed with the commissioner on the 4th of March.

"Face sheets" are made with an original and several copies which go to different departments of the Aetna organization. The file itself, containing one copy, was scheduled to come back to Narum's desk on April 7th. Presumably it did so but no notice was taken or attention paid to the information given on the "face sheet" in the file regarding the SR-21; and none of the officers or departments to whom copies of the face sheet went took any notice of the recitation that an SR-21 was on file in the state motor vehicle department.

Both Mrs. Wiese and Mr. McGinn testified that the purpose of filing SR-21s is to comply with the Safety Responsibility Law.

On the former appeal we held that the filing of an SR-21 might be an admission by the insurer against interest. Whether it might be more and become conclusive on the issue of coverage, together with the materiality of evidence that it had been filed by mistake when no coverage existed, were questions we expressly withheld from decision. *Laughnan v. Griffiths, supra* (p. 259).

On the current trial the court submitted a question (No. 6) in the special verdict: "Did the defendant Aetna Casualty & Surety Company voluntarily file an SR-21 form with the motor vehicle department of the state of Wisconsin to comply with the Safety Responsibility Law, sec. 85.09 (5) (d) of the statutes?"

The jury answered "No" and on motions after verdict the trial court changed the answer to "Yes." Appellants submit that the change was error.

We agree with the trial court that the evidence established as a matter of law that Aetna investigated the facts and then, acting through an agent whom it had certified to be authorized, it voluntarily filed an SR-21 admitting coverage. There was no fraud practiced upon the company and we do not consider it can avail itself, on the ground of mistake, of the testimony which establishes merely intraoffice negligence and divided authority.

We still have the issue of whether the filing is only an admission against interest, and thereby evidence whose effect is for the jury, or whether the filing conclusively establishes coverage. Under the present circumstances we consider our decision in *Behringer v. State Farm Mut. Automobile Ins. Co.* (1957), 275 Wis. 586, 593, 82 N. W. (2d) 915, is appropriate. There we said:

"We are therefore constrained to hold that, when a company has through an authorized officer, employee, or agent filed an SR-21 with the commissioner for the purpose of complying with the Safety Responsibility Law, the company cannot thereafter deny liability upon its policy because of any act occurring, or fact existing, as of the time of such filing, which it then knew, or could have known through the exercise of due diligence. In other words, the legal effect of filing an SR-21 under such circumstances is to conclusively certify that under the facts then existing its policy insured both the named owner and the named operator of the particular vehicle described in the SR-21 as to which the same was filed.

"In those situations where greater liability is imposed upon the insurance company, which has filed an SR-21, than it originally contracted for when it issued its policy, the same is one imposed by statute as a result of its voluntary act in filing the SR-21."

We conclude that Aetna has conclusively and irrevocably admitted coverage of Dale Smith.

The form of SR-21 required by the commissioner of motor vehicles at the time of the accident contained a statement that the policy, whose number and other identifying information, were to be inserted by the insurer, afforded limits of $5,000/$10,000 for bodily injury. Such a form, with the policy number supplied, was the one signed and filed by Alice Teresinski in behalf of Aetna. Aetna now submits that, if the SR-21 makes it liable, its liability is limited by the representation of $5,000/$10,000, which was the statutory minimum, sec. 85.09 (5) (c), Stats., rather than by its policy actually issued whose limits for bodily injury are $10,000/$20,000. We are not able to agree. We consider that the SR-21 brings before the court the actual policy therein described, extended to include in its provisions the individual whom the SR-21 asserts is covered, and it is that policy which is thenceforth to be dealt with. Its terms are not to varied to the insurer's advantage by the insurer's failure to correct the printed form in its recitation of policy limits. Aetna merely signed and filed the official form, but it did not thereby acquire policy limits different from those expressed in the actual policy which the SR-21 declared protected Dale Smith.

We conclude that the judgments against Aetna Casualty & Surety Company, including those for contribution, were properly rendered and must be affirmed.

This disposition makes it unnecessary to consider the motions of various plaintiffs to review for errors which they assert were prejudicial to them.

*By the Court.*—Judgments affirmed.

WINGERT, J. (*dissenting in part*). I cannot agree with that part of the decision which holds that Aetna Casualty & Surety Company is liable beyond the minimum limits of $5,000 for one person and $10,000 for all persons injured

in the accident, which were specified in the Safety Responsibility Law (sec. 85.09 (5) (c), Stats.), at the time of the accident. I agree with the majority that having filed the SR-21, Aetna cannot wholly repudiate it and escape liability altogether, but I think its liability is limited by the statutory figures and not by the higher policy limits.

In my view Aetna's liability does not result from any waiver or estoppel in favor of the plaintiff or Smith's estate or Aetna's insured. The mistaken filing of the SR-21 was not such an intentional relinquishment of a known right as should constitute a waiver in their favor. There is no proof of any such action in reliance upon the filing, to the prejudice of the parties claiming the estoppel, as would normally be required to create an estoppel. To test these propositions, let us suppose that instead of filing an SR-21 Miss Teresinski had mistakenly given plaintiffs and Smith's administrator, verbally or by letter, the same information that was contained in the SR-21, that the Aetna policy covered Smith and the Cadillac he was driving for $5,000/$10,000 limits; and that plaintiffs and Smith's administrator and Aetna had thereafter proceeded exactly as they have in the present case. I do not believe it could be seriously contended in such a case that the mistaken statements alone would have barred Aetna from showing the true fact and maintaining its defense that the policy did not cover the car driven by Smith.

I think the liability in a case like the present results only from the statute, and should extend only as far as necessary to carry out the purpose of the statute. The Safety Responsibility Law, sec. 85.09 (5), Stats., requires that the license of the operator and the registration of the owner of the automobile shall be suspended unless security be deposited for the payment of any judgment for damages resulting from the accident, or, in the alternative, such operator or owner have in effect a policy of automobile liability insurance with

at least specified limits, which at the time of this accident were $5,000/$10,000. The purpose of the statute is to require minimum coverage in those amounts, carefully fixed by the legislature, as an alternative to deposit of security or suspension of the license and registration.

When the insurer files an SR-21 certifying that an insurance policy complying with the statutory requirement is in effect with respect to the particular automobile and driver, thus affording the basis for leaving the license and registration unsuspended, the insurer will not later be permitted to say that the minimum coverage necessary to meet the statutory requirement did not in fact exist. Public policy, as embodied in the statute, will not permit the insurer to assert that the statutory substitute for security required as a condition of not suspending the license and registration does not exist, after they have been permitted to remain unsuspended on the strength of the certification that such statutory substitute does exist.

The statutory purpose is fully carried out when the Insurance Company is held liable to the extent of the minimum policy limits specified in the statute. That purpose justifies refusal to permit the insurer to assert that insurance coverage up to those limits was not in effect. It does not, however, justify refusal to permit the insurer to show its mistake beyond those limits, where the ordinary elements of waiver and estoppel in favor of the plaintiff and the insured are not present.

To go further and hold that an innocent mistake which has hurt none of the parties and in reliance on which none of them has changed his position to his detriment forecloses the Insurance Company from asserting the true fact that there was no coverage beyond the statutory $5,000/$10,000 limits, appears to me both unjust and contrary to applicable legal principles. It imposes a severe penalty on the insurer for a wholly innocent mistake prejudicial to nobody, brings

unjust enrichment to the party mistakenly certified as covered by the policy by giving him insurance coverage for which neither he nor anyone else contracted or paid, and may create a windfall for the plaintiff. These results are more apparent in the *Henthorn Case* (*Henthorn v. London & Lancashire Indemnity Co.*, post, p. 180, 83 N. W. (2d) 759), where the policy limit of liability for injury to a single person was $50,000 as compared with the statutory requirement of $5,000, and the rule of the present case may operate to increase the insurer's liability, for which it received no premium, by $45,000 and correspondingly enrich the insured by reason of an equally innocent mistake, prejudicial to neither the plaintiff nor the insured.

A principle which will produce such a penalty on the one side and corresponding unjust enrichment on the other ought to be avoided if possible. I think the requirements of public policy as manifested by the Safety Responsibility Law would be as well served, and the interests of justice and conformity to hitherto accepted legal principles better served, by a rule which would limit the liability of the Insurance Company in such circumstances to the minimum policy limits required by the statute.

Mr. Justice STEINLE joins in this dissent.