FEDERAL MORTGAGE COMPANY, Appellant, vs. SIMES,
Respondent.
FEDERAL MORTGAGE COMPANY, Appellant, vs. BACH,
Respondent.
FEDERAL MORTGAGE COMPANY, Appellant, vs. GIES,
Respondent.
FEDERAL MORTGAGE COMPANY, Appellant, vs. LAUER,
Respondent.

*October 14, 1932—January 10, 1933.*

For the appellant there were briefs by *Mayer, Wilde & Haertle*, attorneys, and *Walter F. Mayer* of counsel, all of Milwaukee, and oral argument by *Mr. Mayer*.

For the respondent Simes there, was a brief by *Fish, Marshutz & Hoffman*, attorneys, and *I. A. Fish* of counsel, all of Milwaukee, and oral argument by *Mr. Fish*.

For the respondents Bach and Gies there were briefs by *Churchill, Bennett, Churchill & Davis*, attorneys, and *Jos. E. Rapkin* of counsel, all of Milwaukee, and oral argument by *Richard R. Davis*.

*Charles D. Ashley* of Milwaukee, for the respondent Lauer.

The following opinion was filed November 9, 1932:

OWEN, J. These actions were commenced separately but were consolidated for the purposes of trial. They are actions for money had and received, based upon identical facts, involve the same questions of law, were briefed and argued together in this court, and will be disposed of in a single opinion.

The plaintiff corporation was promoted and organized in 1924 as a second-mortgage finance company, with a capital stock of 1,000 shares, seven per cent. preferred, par value $100, and 5,000 shares no par value common stock, by J. A. Barry, Frank J. Meyer, W. D. Isham, W. D. Harper, and Ralph Meyer. These promoters became the directors of the corporation, and were such until the annual stockholders' meeting of February 8, 1928, except that Barry resigned in July, 1926, and the vacancy was filled in December, 1926, by the election of Bruno Betzolt. From the inception of the

company until the annual stockholders' meeting in February, 1928, Frank J. Meyer was president, W. D. Harper was vice-president, and W. D. Isham was secretary-treasurer.

Following the organization of the corporation, the officers made application to the Railroad Commission for a permit to sell its capital stock. To induce the commission to permit the organizers to subscribe for 2,500 shares of the common stock at $1 per share, they assured the commission that they would subscribe for 190 shares of the preferred stock and pay therefor the sum of $19,000. The commission then granted the permit to sell the stock in units of one share of preferred and two and one-half shares of common at $102.50 per unit.

On December 17, 1924, the capital was increased from $100,000 preferred to $250,000, and from 5,000 shares common to 7,000 shares. Thereupon the officers filed another application with the commission for a permit to sell the increased stock, at which time the commission discovered that the promoters had not subscribed and paid for the 190 shares of preferred stock, which was the condition upon which the first permit was granted. The commission refused to permit the sale of the additional $150,000 preferred stock, but suggested that a new class of $150,000 of participating preferred stock be created. However, the commission would not issue a permit to sell this stock until the promoters had bought and paid for 190 shares of the participating preferred stock, and granted an interlocutory permit authorizing the promoters to buy that stock. The promoters finally bought and paid for the 190 shares of participating preferred stock, when the commission issued a permit for the sale of the entire issue of participating preferred. As a condition of the interlocutory order, however, the commission required the 190 shares of stock bought by the promoters to be placed in escrow for a period of two years. The fact is that the promoters did not

have the money with which to pay for the 190 shares of stock, and they borrowed from the defendant Simes $10,030; defendant Bach, $3,060; defendant Gies, $1,530; and from the defendant Lauer, $1,530. They executed to each of the defendants their joint and several promissory notes for the amount borrowed from each of the said defendants, as collateral security for which they assigned to the defendants a *pro rata* share of their interest in the stock of the company deposited under the escrow agreement with the Marshall & Ilsley Bank. The stock was placed in escrow for a period of two years, to give assurance to the commission that those in the management of the company would have a financial interest at least to that extent in the company for a period of two years, and the notes given by the promoters to the several defendants were due in two years from date. When the notes became due, the promoters, apparently, were as destitute of means with which to pay the notes as they were when the notes were given. As the interest on these notes became due, the officers of the company issued the company's checks, payable to the defendants, for the amount of the interest due, and when dividend checks were issued a month later to themselves on the stock held in their name, they indorsed and redeposited such checks to the company's account. When these notes became due in June, 1927, they were renewed for six months, and the stock, then released from escrow, was deposited as collateral security for the payment of the notes. These notes were each executed to the defendants for the amount of the original notes, and each signed as before by all of the promoters as joint and several notes.

On July 12, 1927, there was a meeting of the board of directors of the plaintiff corporation. The minute book of that meeting shows the following:

"Mr. Isham stated that notes of the directors given in settlement of stock would be due very shortly. He gave a

brief outline of the formation of the company and how it became necessary to satisfy the Railroad Commission for the directors to purchase 190 shares of stock. The following being the reasons: First, by the directors' failure to buy and retain $19,000 worth of preferred stock. Second, by Mr. Ralph Meyer selling some of his customers three shares of common instead of two and one-half shares as allowed by the permit. He then stated that the Railroad Commission had granted a permit to sell the participating issue upon condition that the directors purchase $19,000 worth of participating preferred stock to be placed in escrow with the Marshall & Ilsley Trust Company. This was accomplished by the directors borrowing a sum in the aggregate of $16,500 from Messrs. Bach, Lauer, Gies, and Simes, giving as security escrow receipts issued by the Marshall & Ilsley Trust Company. The two years now having expired, notes of the above gentlemen are due. We having discharged our obligations to the Railroad Commission, were granted the return of the stock. Mr. Isham stated that so far as he was concerned he was not in a position financially to meet any part of the indebtedness. There did not seem to be any unanimous desire on the part of the other directors to pay the notes and it was suggested by Mr. Isham that a clause in our stock certificates permitted the purchase by the directors of stock at the proper price. Thereupon he read the following statement: 'The corporation may from time to time, at the option of its board of directors, purchase any of the outstanding preferred stock, but shall have no right upon purchasing such stock to retire same. Such purchases shall be made from time to time only at such prices and for such amounts as will permit the reselling of said stock for a consideration, including the expense of the sale, as will occasion no financial loss to the corporation.' He explained further that he did not feel it fair to ask the officers and directors who were doing all the work of conducting without pay to assume this obligation, and felt that it was proper under this clause to buy the 190 shares of stock in question with corporation funds. Whereupon Mr. Harper moved that the officers be directed to purchase the above described 190 shares of participating preferred stock at the best price and terms possible, not exceeding $85 per share; common stock held by Messrs. Bach, Lauer, Gies, and

Simes, also to be repurchased. Motion was duly seconded by Mr. Ralph Meyer, and upon request of Mr. Harper the secretary called the roll, all voting 'aye.' There being no further business to come before the board, it, upon motion, adjourned. (Signed) W. D. Isham, Secretary."

All of the directors except J. A. Barry were directly interested in this transaction. A stockholders' meeting was held on February 8, 1928. The financial statement of the company, which was distributed to the stockholders at that meeting, contained the following language: "Contracts to purchase 190 shares of participating preferred stock at $85 to be paid in monthly instalments," and at that meeting Mr. Isham, secretary-treasurer of the company, explained in detail the transaction to which the above language referred. There was present at this meeting about eighty-five per cent. of the stockholders. No action was taken at the meeting with reference to the transaction. It was apparently passed in silence. It will be noted that the contract by which the stock was purchased was to be paid for in instalments. Checks of the company were drawn to and delivered to each of the defendants and, as they received these checks, the amount thereof was credited upon the notes and indebtedness of the directors to them, and when the full amount of the indebtedness was paid, the stock, which was held by the defendants as collateral security, was turned over to the treasurer of the company.

These actions were brought in October, 1929, for the purpose of recovering from the defendants the money so paid to them out of the treasury of the company. They are in the nature of actions for money had and received, which the defendants should not in good conscience be permitted to keep and enjoy, in reliance upon the principle of law which may be stated generally to be, that one receives at his peril from an officer of a corporation the securities of such corporation in payment of the officer's personal debts, and that where a

person receives from such an officer for the individual use of the officer corporate obligations drawn by the officer in his own favor, such person is put upon inquiry to determine whether the officer has the right to so use such obligations.

The transaction here under consideration may be stated tersely as follows: The directors of the corporation sold to the corporation their own stock, in which transaction they represented both the corporation and themselves. This results from the fact that four out of five of the directors owned the stock which was sold to the corporation, and it was necessary for the vending directors to act for the corporation in order to constitute a quorum, and they in fact did act for the corporation.

The appellant claims that this transaction was utterly void, under the principles of law declared in *Timme v. Kopmeier,* 162 Wis. 571, 156 N. W. 961. That case lays down the rule that any participation by directors in contracts dealing with matters of corporate interest which is antagonistic to their free and impartial discharge of official duties, is denounced by the law, unless all of the stockholders with full knowledge assent thereto. In that case one of the directors entered into a contract with an employee of the company who was purchasing some of the company's stock from the company, to repurchase the stock from the employee if his employment with said company is discontinued, either by mutual agreement of the said company and the party of the first part (the employee) or by the death of the party of the first part (the employee), or by the act of either said party of the first part or said company, or by operation of law, or for any reason whatsoever. The court held that in view of the fact that the company might terminate the relation, and that the director, in acting upon such a proposal, might have an interest by virtue of this contract conflicting with the interest of the corporation, he was placed in a position which might inter-

fere with his exercise of the best of faith in the protection of the company's interest. It seems that this is a special type of contract that has received frequent consideration by the courts, both where the original purchase by the employee is from the corporation with an option agreement on the part of the corporation to repurchase in case the employee relationship is terminated, and where the original purchase is from a stockholder or director with a like option agreement. While all authorities hold such an option agreement on the part of the corporation to be valid, they are divided upon the validity of such agreement on the part of a director. Those holding such agreements to be invalid place it on the ground that the director might, in order to protect his personal interests, vote to discharge or not to discharge the employee when, but for the contract of repurchase, he might have done otherwise. Such contracts are declared void because the policy of the law prohibits a director from having any personal interests which influence his official acts in protecting the interests of the corporation. See annotation upon this question in 48 A. L. R. p. 625.

Now the contract here involved is not the kind of a contract that was involved in the *Timme Case*. It is a contract or transaction by which the director sells his property to the corporation. It is settled in this state at least that a director may have contractual relations with the corporation of which he is a director, but the validity of such contracts will require the utmost candor and fair and open dealing on the part of the director, and all such transactions will be scrutinized closely by the courts for assurance that the interests of the corporation have not been injured by reason of such transactions. Where, however, the transaction is accompanied by open, fair, and honest dealing, and the interests of the corporation have not been injured, the contract will be enforced. Perhaps the leading case in this state upon that question is

*Figge v. Bergenthal,* 130 Wis. 594, 109 N. W. 581, 110 N. W. 798, citing in support of the doctrine *Spaulding v. North Milwaukee Town Site Co.* 106 Wis. 481, 81 N. W. 1064; *Milwaukee Cold Storage Co. v. Dexter,* 99 Wis. 214, 74 N. W. 976; *Twin-Lick Oil Co. v. Marbury,* 91 U. S. 587; *Richardson's Executors v. Green,* 133 U. S. 30, 10 Sup. Ct. 280. See, also, *Globe Woolen Co. v. Utica Gas & E. Co.* 224 N. Y. 483, 121 N. E. 378. In 4 Fletcher on Private Corporations, at sec. 2333, it is stated that "except for a few straggling cases of more or less doubtful authority, it is well settled in nearly all jurisdictions that transactions or contracts wherein a director or other corporate officer is interested adversely to the corporation are not void, but are merely voidable at the option of the corporation, unless such dealings are otherwise void as against public policy."

In this state a solvent corporation may purchase its own stock if not prohibited by its articles of organization or some statute. *Shoemaker v. Washburn Lumber Co.* 97 Wis. 585, 73 N. W. 333; *Marvin v. Anderson,* 111 Wis. 387, 87 N. W. 226; *Pabst v. Goodrich,* 133 Wis. 43, 113 N. W. 398; *Gilchrist v. Highfield,* 140 Wis. 476, 123 N. W. 102; *Rasmussen v. Schweizer,* 194 Wis. 362, 216 N. W. 481.

The articles of organization of the plaintiff corporation in this case contained the following provision:

"The corporation may from time to time, at the option of its board of directors, purchase any of the outstanding preferred stock, but shall have no right upon purchasing such stock to retire same. Such purchases shall be made from time to time only at such prices and for such amounts as will permit the reselling of said stock for a consideration, including the expense of the sale, as will occasion no financial loss to the corporation."

This was no more than a limitation upon the exercise of this right, and probably left it to the discretion of the directors to determine whether the stock could be so resold. We

do not consider it controlling against the power of the directors to repurchase the stock of the company. This stock was purchased at $85 a share, which means that for each $85 paid out for this stock the stock liability of the corporation was reduced $100. So far as the price paid for the stock is concerned, it appears fair and reasonable. The lower court so found and held that the stock was worth the amount which the company paid for it. If the validity of this contract depended solely upon the question of whether the corporation paid more for the stock than it was worth, it would have to be held, as the lower court did hold, that it was a fair and reasonable contract, and one which could not be avoided by the corporation on the ground that more was paid for the stock than it was worth. However, there is another aspect to this transaction, separate and distinct from the question of whether the contract can be repudiated by the corporation because it may have paid more for the stock than it was worth.

The corporation was engaged in a business where, in order to make money, it was necessary that it have capital. This was the reason for increasing the preferred stock from $100,000 to $150,000. Now the corporation had exerted strenuous efforts for a period of practically two years to sell the additional issue of $150,000 of special preferred stock without complete success. At the time the stock was turned back to the corporation there was still in the neighborhood of $57,000 of the original issue that had not been sold. The repurchase of this stock even at eighty-five cents on the dollar at a time when, concededly, the great need of the corporation was more capital in the business, presented a question of business policy upon which the corporation was not represented. It is apparent from what has been heretofore stated that four of the five directors were motivated entirely by a consideration of their own interests, and acted in accordance with their

own interests rather than the interests of the corporation. It is one thing for a stockholder or director to deal with a corporation in a transaction in which he does not represent the corporation. Even in such cases the transaction will be closely scrutinized to see that no advantage has been taken of the corporation. But quite a different principle applies where a director represents both himself and the corporation in such a transaction. In the latter situation it does not matter whether the transaction results in injury to the corporation or not. In all such cases the contract is voidable on the part of the corporation simply because of the dual interest of the director. The general rule is stated in vol. 4 of Fletcher on Private Corporations (1st ed.) sec. 2340, as follows:

"If an officer of a corporation, either alone or with other officers, represents the corporation in making or authorizing a contract or other transaction, in which he is personally interested, either directly or indirectly, and his action or consent is necessary, the contract or transaction, even though it may not be void or voidable for want of two parties, comes within the well-settled rule that a trustee cannot become interested to the detriment of his *cestui que trust,* or an agent to the detriment of his principal. No principle in the law of corporations, therefore, is founded on sounder reasons, or more surely settled, than the principle that the directors, trustees, or other officers of a corporation, who are intrusted with its interests, and occupy a fiduciary relation towards it, will not be allowed to contract with the corporation, directly or indirectly, or to sell property to it, or purchase property from it, where they act both for the corporation and for themselves. In such a case the transaction is, at the least, voidable at the option of the corporation; and it may be avoided and set aside, or affirmed and any profits recovered, without proof of actual fraud or of actual injury to the corporation. Generally, this rule is applied in case of directors but it is equally applicable to other officers."

It will be noticed that the author says that such a contract is at least voidable. Although he does not negative the fact that the contract may be void, we think the authorities sup-

port the proposition that such a contract is voidable at the option of the corporation.

Thus, in *Flaum v. Kaiser Bros. Co.* 66 Misc. 586, 122 N. Y. Supp. 100, it is said that such a contract "is not binding on the corporation." In *Jones v. Morrison,* 31 Minn. 140, 16 N. W. 854, it is said that such a contract is *"prima facie* voidable at the election of the corporation or a stockholder." In *Parker v. Nickerson,* 112 Mass. 195, it is said of such a transaction that "the principal, unless upon the fullest knowledge of all the facts he elects to confirm the act of the trustee or agent, may repudiate it, or he may charge the profits made by the trustee or agent with an implied trust for his benefit." In *Barr v. New York, L. E. & W. R. Co.* 125 N. Y. 263, at p. 274 (26 N. E. 145), speaking of this rule it is said :

"This rule is deservedly strict in its requirements and operation. It extends to all transactions where the individual's personal interest may be brought into conflict with his acts in a fiduciary capacity, and it works independently of the questions of whether there was fraud, or whether there was a good intention. Where the possibility of such a conflict exists, there is the danger intended to be guarded against by the absoluteness of the rule. *Davoue v. Fanning,* 2 Johns. Ch. 260; *Barnes v. Brown,* 80 N. Y. 527. But the rule does not operate to avoid *ab initio* all transactions of a trustee, where he is interested; but is generally limited in its operation to rendering them voidable, at the election of the party whose interests are concerned in the question of their affirmance or disaffirmance. If, therefore, nothing is done in avoidance, the transaction remains."

In *Wardell v. Union Pac. R. Co.* 103 U. S. 651, 26 Lawy. Ed. 509, it was said that such a contract was "fraudulent and void." This statement, however, simply implies that the contract may be repudiated because fraudulent.

That the contract here under consideration was a flagrant violation of the duties which the directors owed to the corporation is not to be questioned. There could not be a

stronger case for declaring a transaction of this character absolutely void. There was no one acting for or on behalf of the corporation. The interests of the corporation were given no consideration. The transaction was designed to promote the exclusive interests of the directors. The question of whether it promoted the interests of the corporation did not matter and was not considered. However, by the transaction, $19,000 of the outstanding capital stock of the corporation has been restored to it at a reasonable price and its liabilities to that extent reduced. Plainly the transaction is one by which the corporation need not involuntarily be bound, but it is one which it may ratify and affirm. The corporation should not be permitted to keep the stock in its treasury and, at the same time, recover back into its treasury the money paid out therefrom to secure the stock. It should either ratify or disaffirm the transaction, and we think the action to recover back from the defendants the money paid them is premature, until the transaction is repudiated and a tender back of the stock made or offered. It would seem, too, that the directors should be made parties to such an action, so that the defendants could be restored to their respective claims against the directors together with the security which they enjoyed prior to the illegal transaction, enabling a complete re-establishment of the *status quo*. This case is not like *Miley v. Heaney*, 168 Wis. 58, 169 N. W. 64, cited as an authority for its maintenance. In that case Heaney procured the corporation to pay out money to Mrs. Miley for his benefit without any semblance of benefit resulting to the corporation. Heaney not only knew that the money which he received from Mrs. Miley in payment of the stock which he sold to her was the money of the corporation, but he advised and procured the advances from the corporation to Mrs. Heaney. In that case it was correctly held, irrespective of the doctrine of *Timme v. Kopmeier*, therein cited

in its support, that such moneys could be recovered by the corporation unless the payment thereof was assented to by all members of the corporation.

Upon a disaffirmance of the contract in this case, we entertain no doubt of the liability of the defendants to restore to the corporation the moneys that were paid out of the treasury of the corporation in payment of the notes which they held against the directors. Sec. 112.01 (6), Stats., provides:

"If a check or other bill of exchange is drawn by a fiduciary as such, or in the name of his principal by a fiduciary empowered to draw such instrument in the name of his principal, the payee is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in drawing or delivering the instrument, and is not chargeable with notice that the fiduciary is committing a breach of his obligation as fiduciary unless he takes the instrument with actual knowledge of such breach, or with knowledge of such facts that his action in taking the instrument amounts to bad faith. If, however, such instrument is payable to a personal creditor of the fiduciary and delivered to the creditor in payment of or as security for a personal debt of the fiduciary to the actual knowledge of the creditor, or is drawn and delivered in any transaction known by the payee to be for the personal benefit of the fiduciary, the creditor or other payee is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary. in drawing or delivering the instrument."

The checks of the corporation were payable to the defendants as creditors of the directors in payment of debts owed by the directors to the defendants, to the actual knowledge of the creditors, and were known by the defendants to be for the personal benefit of the directors, and under the express terms of this statute they are liable in an action brought by the corporation to recover the moneys so paid. This is but the embodiment of a rule to be found in judicial opinions too

numerous to cite. It is claimed, however, that this rule should not be invoked against the defendants Bach, Gies, and Lauer because they understood and believed that their loans were made to and on behalf of the corporation and not on behalf of the directors. They so testified. The lower court so found. However, the notes which they received evidencing their loans were the individual, joint and several notes of the directors, and, while they testified that they thought they were loaning money to the corporation, the written evidences of the transaction completely negative any ground for such belief, and they should not be permitted to avoid responsibility by a plea confessing their complete lack of understanding of a rather simple business transaction. If as a matter of fact they were laboring under such a misunderstanding, the law imputes to them the knowledge which the written evidences of the true character of the transaction placed before them, and imposes upon them the consequences of such knowledge. Business could not well be transacted if parties to a transaction such as this be permitted to testify that they understood the transaction to be something else. Those who assume to do business are oftentimes charged with knowledge or notice of things which they do not in fact possess, among which may be mentioned the fact that every one is presumed to know the law. The professed simplicity and ignorance of the defendants here, however, is of so simple a character as to reflect upon their intelligence and understanding. Such naïveté cannot be expected to go through a practical world unscathed.

It is further contended that the corporation and its stockholders should be held to have ratified and affirmed the contract by which the stock was returned to the corporate treasury, and that it is foreclosed from maintaining this action by reason of its own laches. In the first place, the corporation has done nothing to affirm the contract. The most that can be said is that it did nothing at all until October 19, 1929,

when this action was commenced. There was no affirmative act of ratification whatever. If there was any implied ratification, it could only be due to the delay of the corporation in taking any action in its disaffirmance of the contract. It therefore comes down to the question of whether its laches has been such as to bar the present action.

It is to be noted that the stockholders as a body knew nothing about this transaction until the stockholders' meeting in 1928, when it was laid before them. However, it would not be surprising if the stockholders did not grasp the situation at that meeting. Certainly they had little opportunity to consult with each other and formulate plans for their protection. It appears that at the next annual meeting, which occurred in January, 1929, a new board of directors was elected, and this action was commenced in the month of October of that year. There is no yardstick by which it can be determined whether the delay in commencing an action such as this, constitutes laches. As said in *Twin-Lick Oil Co. v. Marbury,* 91 U. S. 587, 23 Lawy. Ed. 328:

"The doctrine is well settled that the option to avoid such a sale must be exercised within a reasonable time. This has never been held to be any determined number of days or years as applied to every case, like the statute of limitations, but must be decided in each case upon all the elements of it which affect that question. These are generally the presence or absence of the parties at the place of the transaction, their knowledge or ignorance of the sale and of the facts which render it voidable, the permanent or fluctuating character of the subject matter of the transaction as affecting its value, and the actual rise or fall of the property in value during the period within which this option might have been exercised."

In that case the subject of the contract was oil properties, the value of which fluctuated violently from year to year. The defendant had invested his money in oil properties belonging to the corporation at a time when they were low in

value and the prospects of returns from their operation poor. By Márbury's energy and money he developed the property into a paying proposition, after which an action was commenced on the part of the corporation challenging the transaction by which he came into the title of the property. After a rather full consideration of all the facts and circumstances, the court held that a delay of four years in commencing the action in that case constituted laches.

None of the defendants here have been injured by the delay in challenging the validity of the transaction here under consideration. For aught that appears, that with which the defendants parted is just as valuable now as it was at the time of the transaction. They are in no worse position at this time than they would have been had the action been commenced immediately after the termination of the transaction. Some time must be allowed stockholders for consideration and development of plans to protect their interests in cases such as this, and to hold that laches, by reason of which no one is injured, shall bar them from the enforcement of their rights, would be supported neither in logic nor in justice.

Our conclusion is that this action is prematurely brought. No cause of action exists in favor of the corporation until the sale of the stock, or the purchase thereof by the corporation, is repudiated or rescinded by the corporation. When that is done, any action that may thereafter be brought should join the directors as parties defendant, so that all parties affected by the contract are before the court, where the rights of all can be definitely determined, and the *status quo* re-established so far as may be possible. We have considered the question of whether the case should be remanded with permission to make the directors parties defendant within some reasonable time, and thus permit the present litigation to proceed to a final determination of the rights of all concerned. There are obstacles, however, to such a disposi-

tion of the case. In the first place, it is not known that the corporation will desire to repudiate the transaction and restore the stock. Its present contention is that it may recover the moneys into the treasury without restoring the stock. In that contention we must hold that the plaintiff is in error. Whether, with this understanding of the law, the corporation will still desire to repudiate the transaction and return the stock as a condition of recovery of the money paid, is not definitely apparent. In the second place, the plaintiff had no cause of action at the time this action was instituted. It will have no cause of action until the transaction is repudiated by some affirmative act on its part, a restoration of the stock offered to be made, and the original *status quo* established. These considerations seem to make an affirmance of the judgments of the circuit court imperative.

*By the Court.*—Judgments affirmed.

A motion for a rehearing was denied, with $25 costs in one case only, on January 10, 1933.