KNUTSON and wife, Plaintiffs and Respondents, v. MUELLER, Executrix, and another, Defendants and Respondents: AETNA INSURANCE COMPANY, Defendant and Appellant. [Case No. 466.]

RAJCHEL, Individually and as Special Administratrix, Plaintiff and Respondent, v. MUELLER, Executrix, and others, Defendants and Respondents: AETNA INSURANCE COMPANY, Defendant and Appellant. [Case No. 467.]

*Nos. 466, 467. Argued March 4, 1975.—Decided April 28, 1975.*
(Also reported in 228 N. W. 2d 342.)

200

For the appellant there were briefs by *Prosser, Wieda-bach, Lane & Quale, S. C.* of Milwaukee, and oral argument by *Jack R. Wiedabach.*

For the defendants-respondents there was a brief by *Stewart G. Honeck,* attorney, and *Robert G. Blazek* and *Honeck, Mantyh & Arndt* of counsel, all of Milwaukee, and oral argument by *Stewart G. Honeck.*

WILKIE, C. J.    Julius T. Mueller, founder, president, chairman of the board, and majority stockholder of the Mueller-Krus Corporation, was killed on July 22, 1970, when the 1968 Oldsmobile he was driving collided with a car driven by Elmer Knutson. Knutson was severely injured in the crash and his passenger, Paul J. Rajchel, was killed. Seeking total damages of $850,000, Knutson and his wife sued Mueller's estate, Mueller's personal liability insurer, Allstate Insurance Company, and his company's liability insurer, Aetna Insurance Company. Seeking $46,000 total damages, Rajchel's widow sued Mueller's estate, Allstate, and Aetna, as well as Knutson

and Knutson's insurer.[1] The two actions were consolidated for the purpose of trial on the issue of insurance coverage only.

The central question on this appeal, as on the jury trial, is whether at the time of the accident the 1968 Oldsmobile was owned by the Mueller-Krus Corporation and therefore insured by Aetna ($300,000 liability limit), or owned personally by either Mueller or his wife Genevieve, and therefore insured by Allstate alone ($30,000 liability limit). This question turns on the legal effect of a transaction between Mr. and Mrs. Mueller in the week prior to the crash. Based upon this transaction, the jury found that Mueller-Krus owned the automobile. The trial court entered judgment in accord with the verdict and Aetna appeals. We affirm.

Mrs. Mueller testified that several times in the six-month period prior to the accident Mr. Mueller said he wanted to trade in his 1967 company-owned Ford, buy Mrs. Mueller a new car, and take her green 1968 Oldsmobile (titled in Mrs. Mueller's name) as his company car. During their marriage Mr. Mueller always drove company-owned cars and never owned a car personally. One week before the accident, on July 15, 1970, the Muellers went to a car dealership where Mrs. Mueller selected a new 1970 Oldsmobile. On Friday night, July 17th, Mr. Mueller brought the 1970 Oldsmobile home and according to Mrs. Mueller's testimony, they traded sets of keys. He took the keys to the 1968 Oldsmobile and she took the keys to the 1970 automobile. Then Mr. Mueller said: " 'Now I am going to need the title of the car, the green Oldsmobile.' " The next morning, Saturday, July 18th, Mrs. Mueller signed the back of the 1968 Oldsmobile's title in blank and handed it to her husband. She asked if there was anything else she should do and her

---

[1] In addition to these parties, the Mueller-Krus Corporation was joined as defendant in each action, but then dismissed on stipulation of the parties.

husband said, " 'No, the Mueller-Krus Company will take care of the rest of the transaction down at the company.' " After July 18th Mrs. Mueller never again drove the 1968 car, and Mr. Mueller never again drove the 1970 car. He drove the 1968 Oldsmobile to work the following Monday and Tuesday as well as on Wednesday when the fatal accident occurred. On Monday Mr. Mueller took the 1968 Oldsmobile title to the company and handed it to Earl Johnson, then controller of Mueller-Krus, and said " 'This is the title to my wife's car. Would you please put it in the safe.' " No further conversation took place, and Johnson did put the title in one of the company's safes.

The first and primary issue on this appeal is whether the trial court properly instructed the jury on the law concerning transfer of automobile ownership. The trial court instructed the jury that the time of transfer of automobile ownership depends upon the intent of the parties.[2] In essence, the court instructed the jury that

---

[2] The court said, in relevant part:

"The time transfer of title to an automobile becomes effective depends on the intentions of the parties, and unless explicitly agreed delivery is to be made without moving the automobile, then title passes at the time the title is transferred. If it is agreed that ownership is to be transferred immediately without the moving of the automobile and without the necessary documentary title paper, then title passes at the time and place of contracting or making such agreement.

"Before you can answer this question in the verdict you must first find that Genevieve Mueller and Julius Mueller made an agreement to exchange their automobiles, whether or not Genevieve Mueller's automobile was to be transferred to Julius Mueller individually or to the Mueller-Krus Corporation, and further as to whether such transfer of title was to take place immediately in either event.

"Before you can find that it was the intention of the parties that title to the 1968 Oldsmobile was to be transferred immediately to the Mueller-Krus Corporation, you must also find that Julius Mueller had the corporate authority to make such agreement.

after considering all the words and actions of Mr. and Mrs. Mueller, as well as their subsequent conduct, they should find that Mueller-Krus owned the 1968 Oldsmobile at the time of the accident if they determined that Mr. and Mrs. Mueller, agreed to exchange their automobiles, that they agreed the title of the 1968 car was to be transferred to the Mueller-Krus Corporation immediately at the time of the exchange, and that Julius Mueller had the corporate authority to enter such an agreement and accept the 1968 car on behalf of the corporation.

Neither party argues that the court's instruction is inconsistent with sec. 402.401, Stats., of the Uniform Commercial Code. This section provides, in pertinent part:

"402.401 **Passing of title; reservation for security; limited application of this section.** Each provision of this chapter with regard to the rights, obligations and reme-

---

"In order that there be an agreement between the parties, it is essential that there be a meeting of the minds of the parties upon the essential terms and conditions of the subject about which they are agreeing, that is, they must be in accord with the essential terms and conditions of the subject about which they are contracting or agreeing in order to constitute an agreement. There must be a mutual assent. Usually the form of an agreement is that one party makes an offer and the other party accepts the offer.

"An agreement may be written, oral, or partially written and partially oral. To constitute an agreement, the language used and the conduct of the parties must be such as to sufficiently disclose the fact that the minds of the parties have met, or have been in accord, on all the terms of the agreement, or, in other words, disclose the fact that there has been a mutual assent. One party cannot make an agreement, both parties must by their words or actions, assent to the agreement.

"Whether the parties to a contract gave it a particular construction is to be regarded by you in giving effect to the provisions of the contract. The subsequent acts of the parties showing the construction that they themselves have put upon the agreement are to be considered by you for the purpose of assisting you in arriving at a determination of what the arrangement was between the parties."

dies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this chapter and matters concerning title become material the following rules apply:

" . . .

"(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading:

"(a) If the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but

"(b) If the contract requires delivery at destination, title passes on tender there.

"(3) Unless otherwise explicitly agreed where delivery is to be made without moving the goods:

"(a) If the seller is to deliver a document of title, title passes at the time when and the place where he delivers such documents; or

"(b) If the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting."

On this appeal Mrs. Mueller contends that this section of the Uniform Commercial Code controls as to the time of transfer. Aetna, on the other hand, argues that automobile transfers are governed by sec. 342.15, Stats., of the Vehicle Code, entitled "Transfer of Interest in a Vehicle." This section provides in pertinent part:

"(1) If an owner transfers his interest in a vehicle, other than by the creation of a security interest, he shall at the time of the delivery of the vehicle, execute an assignment and warranty of title to the transferee in the space provided therefor on the certificate, and cause the certificate to be mailed or delivered to the transferee, except that if the vehicle being transferred has been junked, . . .

"...

"(3) Except as provided in s. 342.16 and as between the parties, a transfer by an owner is not effective until the provisions of this section have been complied with. An owner who has delivered possession of the vehicle to the transferee and has complied with the provisions of this section requiring action by him is not liable as owner for any damages thereafter resulting from operation of the vehicle."

Aetna argues that Mr. and Mrs. Mueller did not comply with sec. 342.15, Stats., and thus the purported transfer of the ownership of the 1968 Oldsmobile is invalid.

Article two of the Uniform Commercial Code applies to "transactions in goods," [3] and thus is generally applicable to problems arising from transactions involving transfer of automobile ownership.[4] In several prior decisions this court held that questions of insurance coverage turning upon whether ownership of a car had been transferred prior to an accident were to be determined under the Uniform Sales Act, the precursor to the Uniform Commercial Code, according to the intentions of the parties, rather than under any provision of the Vehicle Code.[5] However, these cases were decided based on the law as it existed prior to the revamping of sec. 342.15, Stats., effective June 1, 1966.[6]

The last sentence of new sec. 342.15 (3), Stats., specifically treats the question of time of transfer of ownership as it affects the owner's damages liability:

[3] Sec. 402.102, Stats.

[4] Sec. 402.105, Stats., defines "goods" as "all things . . . which are movable at the time of identification to the contract for sale . . . ."

[5] *Hein v. State Farm Mut. Automobile Ins. Co.* (1966), 29 Wis. 2d 702, 139 N. W. 2d 611; *McWhorter v. Employers Mut. Casualty Co.* (1965), 28 Wis. 2d 275, 281, 137 N. W. 2d 49; *Klapps v. American Ins. Co.* (1965), 26 Wis. 2d 664, 668, 133 N. W. 2d 248; *Liner v. Mittelstadt* (1950), 257 Wis. 70, 75, 42 N. W. 2d 504; *Reynolds v. Wargus* (1942), 240 Wis. 94, 101, 102, 2 N. W. 2d 842.

[6] New sec. 342.15, Stats., was created by Laws of 1965, ch. 485, sec. 9.

". . . An owner who has delivered possession of the vehicle to the transferee and has complied with the provisions of this section requiring action by him is not liable as owner for any damages thereafter resulting from operation of the vehicle."

The necessary implication of this language is that when an owner delivers possession and complies with the requirements of sec. 342.15, Stats., concerning appropriate endorsement and delivery of the title certificate, then not only is he no longer liable as owner, but the transferee would be liable as owner. Thus we conclude that sec. 342.15 (3), rather than the Uniform Commercial Code governs time of transfer of car ownership for purposes of determining liability of the owner in a personal injury action, even though the Uniform Commercial Code governs "as between the parties" with respect to their rights and liabilities arising under the law of sales.

This interpretation is supported by the legislative history of sec. 342.15, Stats. The legislative drafting file of Laws of 1965, ch. 485, sec. 9, which created this section, shows that subs. (1) and (3) of sec. 342.15 were taken substantially verbatim from sec. 14 (a) and (e) of the Uniform Motor Vehicle Certificate of Title and Anti-Theft Act adopted by National Conference of Commissioners on Uniform State Laws in 1955.[7] The most recent commissioner's handbook reveals that the Uniform Act has been adopted in its entirety by five states, but a search of Shepard's and the statutes annotated for these states reveals that the relevant portions have not been judicially interpreted.[8] However, the commis-

[7] *Handbook of the National Conference of Commissioners on Uniform State Laws* (1955), pp. 121, 180.

[8] *Handbook of the National Conference of Commissioners on Uniform State Laws* (1973), p. 369. The provision found in sec. 342.15 (3), Stats., is also found in: Conn. Rev. Stat., sec. 14–179 (d); Mass. Annot. Laws, ch. 90D, sec. 15 (e); Minn. Stats., sec. 168A.10 (5); 62A N. Y. Vehic. & Traffic Law, sec. 2113 (c); 5A General Laws of R. I., sec. 31–3.1–12 (e).

sioner's comment to sec. 14 of the Uniform Act explicitly refers to the portion of the act that is now contained in the last sentence of sec. 342.15 (3), Stats.:

"The bracketed language in Sub-section (e) should be included in the Act as adopted unless other laws of the state clearly fix the time when an owner of a vehicle who transfers it ceases to be liable for its operation." [9]

Thus, the legislature's adoption of this sentence of sec. 342.15 (3), Stats., is evidence of intent that it, rather than the Uniform Commercial Code, should govern questions of when ownership liability begins and when it ceases.

Aetna never requested the trial court for an instruction based on sec. 342.15, Stats. In fact, the proposed instruction of Aetna, adopted in part by the trial court, declared that transfer of ownership depends upon the intent of the parties as manifested in their language and conduct within the circumstances of the case. Aetna did not object while the instructions as given were actually read to the jury, contending that they were in any way inconsistent with sec. 342.15. Moreover, in its written motions after verdict, Aetna again omitted any reference to sec. 342.15. Apparently the issue was raised for the first time in oral argument before the trial court. In its written opinion, the trial court merely noted that Aetna argued that sec. 342.15 governed the time of transfer while "The court's instructions were based on the uniform sales act." The court thus never resolved this problem.

Failure to request instructions or object to the instructions as read, based upon sec. 342.15, Stats., precludes Aetna from raising this issue as of right on appeal.[10] Only in "extraordinary situations" will the court exercise its discretion to review the alleged error despite

---

[9] *Handbook* (1955), p. 180.

[10] *Hein v. Torgeson* (1973), 58 Wis. 2d 9, 17, 205 N. W. 2d 408.

waiver.[11] Where the instructions are erroneous because the trial court failed to instruct on a key point of law discretionary review may be exercised.[12] The court's instructions were erroneous. However, it must be noted that the instructions under the law of sales were consistent with prior decisions of this court,[13] and the question whether creation of new sec. 342.15, Stats., in effect overruled prior law presents a question of first impression. Thus the error in instructions was not the type of obvious error that the trial court should have corrected of its own accord even in the absence of the prompting of the parties.

We conclude, therefore, that Aetna waived its objections to the trial court's instructions on the time of the transfer of ownership. In any event, as we will detail below, the error was not prejudicial.

This brings us to the consideration of the second issue raised on this appeal of whether the jury's verdict as to the automobile ownership is supported by credible evidence. It is.

Of course, a jury verdict will be upheld by this court on appeal "if there is any credible evidence which under a reasonable view will sustain it." [14] Under the law as contained in the instructions, there is sufficient evidence in the record to support the jury's conclusion that Mueller-Krus owned the 1968 Oldsmobile at the time of the accident. The jury could have found that in their transaction several days prior to the fatal accident Mr. and Mrs. Mueller agreed and intended to transfer ownership of the 1968 Oldsmobile to the Mueller-Krus Corporation and that Mr. Mueller, as agent, accepted the transfer on

[11] *Id.* at page 18.

[12] *Baierl v. Hinshaw* (1966), 32 Wis. 2d 593, 603, 146 N. W. 2d 433.

[13] *See* cases cited in footnote 5, *supra*.

[14] *Severson v. Beloit* (1969), 42 Wis. 2d 559, 565, 167 N. W. 2d 258.

behalf of the company. Mrs. Mueller delivered physical possession of the car and the keys to her husband and signed the title certificate. This transaction had been contemplated for several months. Moreover, there was evidence that Mr. Mueller, as president, chairman of the board, and majority stockholder of Mueller-Krus, had the corporate authority (actually exercised on previous occasions) to acquire and dispose of company cars. We conclude that under the court's instructions the jury's verdict is amply supported by the evidence.

Aetna points out correctly that the record does contain evidence contrary to the jury's verdict. There are comments and conduct of various persons which tend to indicate that the transfer never occurred or would only have occurred in the future. However, the failure of the corporate tax and insurance records to reflect ownership of the 1968 car, the fact that Mrs. Mueller signed accident and insurance claim documents, listing herself rather than Mueller-Krus as owner, and the fact that she accepted an insurance payment (subsequently returned) from Allstate, her personal liability insurer, all go to the subjective intent of the parties and the credibility of the witnesses and, as such, are not conclusive, but merely constituted evidence to be evaluated by the jury. Mrs. Mueller said she was "totally divorced" from these matters and relied completely upon the advice of her attorney who was, at the time, apparently unaware of the transaction between Mr. and Mrs. Mueller. The evidence supporting the jury's verdict was not rendered incredible by the existence of this contrary evidence and under such circumstances this court cannot substitute its judgment for that of the jury. We conclude the verdict should be upheld.

Aetna argues Mrs. Mueller is estopped to deny she owned the 1968 Oldsmobile because she was listed as the owner in the accident report, SR–19, filed with the

Motor Vehicle Department. True, in *Laughnan v. Aetna Casualty & Surety Co.*[15] the court held an insurer estopped to deny coverage once coverage had been admitted in the standard form, SR–21. However, Aetna cites no authority holding the insured similarly bound. Moreover, the present version of sec. 344.15 (5), Stats., gives the insurance company thirty days in which to correct an SR–21 to assert certain defenses to coverage, after which time the defenses are lost. This provision has been strictly confined to the particular policy defenses listed and none other,[16] and does not represent authority justifying a holding that Mrs. Mueller should be estopped to deny she owned the car.

Even if Aetna did not waive its argument that sec. 342.15, Stats., should control here, we would still hold that Mueller-Krus owned the car at the time of the accident. Since the jury, as instructed, must have found that Mrs. Mueller delivered physical possession of the car to her husband as agent for the company, the narrow legal question presented on appeal as pertaining to this issue is whether, in signing the back of the title certificate in blank and giving it to her husband, Mrs. Mueller adequately satisfied the statutory requirement contained in sec. 342.15 (1) that the owner:

". . . at the time of the delivery of the vehicle, execute an assignment and warranty of title to the transferee in the space provided therefor on the certificate . . . ."

Is Mrs. Mueller's blank endorsement, without filling in the name of Mueller-Krus as "purchaser," sufficient? It is.

Prior to the adoption of sec. 342.15, Stats., the section governing this matter was sec. 342.18 (1) (a), Stats. 1963, which explicitly required the owner, in addition to

[15] (1957), 1 Wis. 2d 113, 83 N. W. 2d 747.

[16] *Holmgren v. Strebig* (1972), 54 Wis. 2d 590, 196 N. W. 2d 655.

signing the title, to "Endorse upon the certificate of title in the spaces provided therefor the name and address of the transferee." Sec. 342.15 now contains no such explicit command. We conclude, therefore, that by signing the certificate and transferring it to her husband as an agent for Mueller-Krus, Mrs. Mueller warranted title and assigned her ownership interest in compliance with statutory requirements. An endorsement in blank and delivery to a transferee is sufficient to convey ownership rights in commercial paper,[17] warehouse receipts and bills of lading,[18] and investment securities.[19] We see no reason why a similar principle should not apply here. Thus, we conclude that even if Aetna did not waive its objection to the instruction given as to the time of transfer of ownership of the 1968 Oldsmobile, the terms of sec. 342.15 (1) and (3) were complied with, making Mueller-Krus the owner of the 1968 automobile at the time of the accident.

The third issue raised on this appeal is whether the trial court erred in refusing to give the instruction requested by Aetna concerning Mr. Mueller's authority to act as an agent of Mueller-Krus Corporation. Aetna contends that Mr. Mueller was not acting as agent for the corporation in the disputed transaction with Mrs. Mueller. Aetna suggests rather that Mr. Mueller or his wife stood to gain from the transaction since the value of the 1970 Oldsmobile exceeded the 1968's value, and that therefore the transaction is absolutely void.[20] However, where a director or officer sells property to the corporation, such contracts are not void, but merely

[17] Secs. 403.201 (1) and 403.202 (1), Stats.

[18] Sec. 407.501 (1) and (2) (a), Stats.

[19] Secs. 408.301 (1), 408.308 (1) and (2), and 408.309, Stats.

[20] Kline v. Little Rapids Pulp Co. (1932), 206 Wis. 464, 240 N. W. 128 (raw material supplier received long term favorable contract signed by president after supplier bought stock from president). See: Davies v. Meisenheimer (1949), 254 Wis. 419, 425, 426, 37 N. W. 2d 93.

voidable at the option of the corporation. As the court said in *Federal Mortgage Co. v. Simes:* [21]

". . . 'except for a few straggling cases of more or less doubtful authority, it is well settled in nearly all jurisdictions that transactions or contracts wherein a director or other corporate officer is interested adversely to the corporation are not void, but are merely voidable at the option of the corporation, unless such dealings are otherwise void as against public policy.' "

In the absence of bad faith, dishonesty, or fraud, and actual injury to the corporation, such contracts will be upheld.[22] Even where the officer represents both himself and the corporation, the transaction is still not void, but rather voidable at the corporation's or shareholder's option.[23] Moreover, and importantly, creditors or third parties do not have the power to void such transactions.[24]

No evidence here compels a conclusion that the transaction between Mr. and Mrs. Mueller should be declared void. Mr. Mueller accepted transfer of the 1968 Oldsmobile to the corporation. Although there was evidence in the record to support the fact that the 1970 Oldsmobile bought and owned by the corporation was worth more than the 1968 Oldsmobile, its ownership was not in fact actually transferred to Mrs. Mueller at the time of the transaction involving the 1968 car. The certificate of title was not assigned until after the accident and then only as a gift. Moreover, even if the gift had not been given, there was evidence that before the final transfer of the 1970 car occurred, both cars would be appraised and Mrs. Mueller would make a payment to the corporation to make up any difference in value.

---

[21] (1933), 210 Wis. 139, 148, 245 N. W. 169, quoting 4 Fletcher, *Private Corporations,* sec. 2333. The same language is found in 3 Fletcher, *Cyc. Corp.* (Perm. ed., 1965 rev.), p. 365, sec. 917.

[22] 210 Wis. at page 147.

[23] *Id.* at pages 150, 151.

[24] 3 Fletcher, *Cyc. Corp.* (Perm. ed., 1965 rev.), p. 502, sec. 977.

The final issue raised on this appeal is whether Mrs. Mueller's testimony concerning conversations with her now deceased husband are barred by the dead man's statute.[25]

There is no question that Aetna made the proper objection motions necessary to preserve this alleged error. We conclude, however, that Aetna is not entitled to the protection of the statute.

Sec. 885.17, Stats., is designed to protect the principals of deceased agents from fraudulent claims. At the time of the transaction with his wife Mr. Mueller was acting as agent for Mueller-Krus. However, Mueller-Krus was dismissed as a party to this action and did not itself object to Mrs. Mueller's competency to testify. Instead, Mueller-Krus's insurer, Aetna, is raising the objection. No evidence suggests that Mr. Mueller was acting as agent for Aetna at any time. Thus the narrow question is whether, within the meaning of sec. 885.17, Aetna derives its "interest or title," "from, through, or under" Mueller-Krus Corporation by virtue of its insurance contract with Mueller-Krus. We conclude that Aetna does not.

[25] Sec. 885.17, Stats.: "**Transactions with deceased agent.** No party, and no person from, through or under whom a party derives his interest or title, shall be examined as a witness in respect to any transaction or communication by him personally with an agent of the adverse party or an agent of the person from, through or under whom such adverse party derives his interest or title, when such agent is dead or insane, or otherwise legally incompetent as a witness unless the opposite party shall first be examined or examine some other witness in his behalf in respect to some transaction or communication between such agent and such other party or person; or unless the testimony of such agent, at any time taken, be first read or given in evidence by the opposite party; and then, in either case respectively, only in respect to such transaction or communication of which testimony is so given or to the matters to which such testimony relates."

In *Chamberlain v. Prudential Ins. Co. of America* [26] the court considered a similar problem. The plaintiff widow claimed an insurance agent of defendant had, in the presence of plaintiff and her husband, represented that after payment of a small premium an insurance policy would become immediately effective. A written receipt for the premium stated, however, that no policy would be in effect until an application had been accepted by the company and a formal policy issued. A week later when the husband died, the application had not been accepted and no policy had been issued. The insurer denied coverage and the widow sued. The trial court rejected Prudential's argument that the dead man's statute rendered the widow incompetent to testify concerning the insurance agent's oral representations, and this court affirmed. At issue, as in the instant case, was the legal effect of the contractual relationship between the insurer and the insured. The court said:

"The plaintiff was allowed to testify, against objection and exception, to the conversation between her husband and the agent of the defendant, and this ruling is now assigned as error. The objection made was that the testimony was inadmissible under sec. 4069, Stats. 1898, which excludes testimony of a party as to transactions personally had with a deceased person when the opposite party 'sustains his liability' from, through, or under such deceased person. The question is, Does the insurance company, in any sense, sustain its liability 'from, through, or under' Chamberlain? We do not see how the question can be answered in the affirmative. It is true that the insurance company was dealing with Chamberlain in the transaction, but it was the opposite party in the deal. It sustained its liability, if any, through its contract with Chamberlain, but in no reasonable meaning of words through or under Chamberlain. We perceive no error in the ruling." [27]

[26] (1901), 109 Wis. 4, 85 N. W. 128.
[27] *Id.* at page 8.

Similarly, here, we conclude that, by virtue of its contract of insurance, Aetna did not derive its interest "from, through, or under" the insured, Mueller-Krus; therefore, Aetna is not entitled to protection under the statute. We have often held for a very strict interpretation of the dead man's statute.[28]

Aetna's brief indicates it is solely relying upon sec. 885.17, Stats., rather than sec. 885.16, another dead man's statute. To claim protection under this latter statute, Aetna would have to derive its title or sustain its liability "from, through, or under" Mr. Mueller, a criterion clearly not satisfied in this case.

We have considered the other contentions of Aetna, objecting to portions of the trial court's instructions to the jury, and we find the instructions neither erroneous nor prejudicial. Although some of the language could no doubt be improved upon, the trial court's intended meaning in every instruction is clearly apparent to the " 'ordinarily intelligent mind.' "[29]

*By the Court.*—Order and judgment affirmed.

DAY, J., took no part.

---

[28] *Estate of Molay* (1970), 46 Wis. 2d 450, 458, 459, 175 N. W. 2d 254. In its Proposed Rules of Evidence for Wisconsin, the Judicial Council recommended that this court abolish the dead man's statute. However, the rules, as approved by the court effective January 1, 1974, left the matter to the legislature. Sec. 906.01, Stats., *see* Judicial Council Committee's Note to sec. 906.01, 59 Wis. 2d R157, R158. *See also: Johnson v. Mielke* (1970), 49 Wis. 2d 60, 73, 181 N. W. 2d 503; McCormick, *Evidence* (2d ed.), p. 143, sec. 65.

[29] *Wilson v. State* (1973), 59 Wis. 2d 269, 291, 208 N. W. 2d 134.